IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DEBRA A. DORRIS                         )
                                        )
v.                                      )    No. 3:04-0299
                                        )    Judge Trauger/Brown
DELL PRODUCTS, L.P.                     )


To:  The Honorable Aleta A. Trauger, District Judge


## REPORT AND RECOMMENDATION

### I.  Introduction

By order of the District Judge (Docket Entry No. 48),
this case was referred to the undersigned for a report and
recommendation on defendant's pending motion for summary judgment
(Docket Entry No. 36).  Despite having been granted extensions of
the response deadline following her counsel's withdrawal from
representation (Docket Entry Nos. 44, 46), plaintiff has been
unable to secure new counsel and has failed to respond, *pro se*,
to the summary judgment motion.  Despite this lack of opposition,
the Magistrate Judge has fully considered the proof and argument
submitted in support of the summary judgment motion, and for the
reasons given below, recommends that the motion be **GRANTED**.

1

## II. Undisputed Facts[1]

**Hiring of Plaintiff**

Plaintiff began working for Dell as a production associate in 1999. (Deposition of Debra Dorris, hereinafter "Plaintiff" at 10-11). Plaintiff was one of the original group of employees hired to open the Dell plant in Wilson County (the "EG1" facility). (Plaintiff at 11). Plaintiff was 43 years old at the time of her hire. (Plaintiff at 6). In the Spring of 2000, plaintiff was promoted to an MR Coordinator (MRC) position at Dell's Nashville facility (the "AM1" facility). (Plaintiff at 12, 13-14). The MRC position was a grade A-5 and plaintiff's previous position was a grade A-4. (Plaintiff at 11, 13-14).

**The Realignment and Consolidation**

In May 2002, Dell decided to realign its operations in Middle Tennessee by relocating the manufacture of Inspiron/Latitude portables (laptops) from its Nashville facility. Decisions regarding placement of employees who were transferring from AM1 to EG1 as a result of the consolidation were based upon shift and seniority. EG1 employees were not bumped from their positions as a result of the consolidation but rather AM1 employees were placed into open positions around the

---

[1]Pursuant to Local Rule 56.01(g), the Court adopts defendant's unopposed statement of undisputed material facts (Docket Entry No. 38), which is replicated in defendant's summary judgment memorandum and in the above fact statement. The citations to plaintiff's deposition include references to the page number(s) of the transcript, rather than the page numbers generated by the Court's electronic filing format.

2

current EG1 employees.  AM1 employees on first shift had the first opportunity to be placed into similar pay grade first shift jobs at EG1, according to their seniority.  AM1 employees on second shift had the first opportunity to take similar pay grade second shift jobs at EG1 based upon seniority.  Many employees were placed into lower grade positions  at EG1 because there simply was not a need for many higher grade employees at EG1 following the production consolidation.  Therefore, AM1 employees with lower seniority than their counterparts were placed into lower grade positions at EG1.  However, their pay remained the same at that time.  (Affidavit of James Pattison, hereinafter "Pattison" Aff. at ¶ 3).

Prior to the consolidation, four Dell employees at AM1 held the grade A-5 MRC position, including plaintiff.  (Pattison Aff. at ¶ 4).  Following the consolidation, Dell only needed one MRC for the distribution work that was remaining at AM1 and no MRC positions were added to EG1.  The only MRC position remaining at AM1 was a first-shift position.  Kelly Beasley, the most senior first-shift MRC, retained that position.  Ms. Beasley, age 34, and plaintiff had identical hire dates with Dell; however, plaintiff worked the second-shift.  (Plaintiff at 21; Pattison Aff. at ¶ 4).  Therefore, Ms. Beasley retained her first shift MRC position at AM1.  Plaintiff was placed in an A-4 position at EG1, one grade lower than her MRC position, but her pay was

3

maintained at the same level.  (Pattison Aff. at ¶ 4).

Additionally, the two other MRCs, Michael Wright (1st shift) and

Nakia Bell (2nd shift) were also given A-4 positions at EG1.

Both Mr. Wright and Ms. Bell were under forty at the time.

(Pattison Aff. at ¶ 5).

**Plaintiff's Termination**

After the consolidation in May 2002, plaintiff worked

the second-shift at EG1 in various job positions until September

2002, when she began working the Alternative Work Schedule

("AWS") shift.  (Plaintiff at 27, 42-43).  Employees on AWS work

twelve hour shifts over three days – Friday through Sunday -

typically from 5:30 or 6:00 a.m. to 6:00 or 6:30 p.m.  (Plaintiff

at 41 and Affidavit of Christopher Valentino, hereinafter

"Valentino" Aff. at ¶ 3).  During this time period, plaintiff's

supervisors were Lamont Taylor, Eric Soliz, and Abe Vongsavath.

(Plaintiff at 50).

At the end of September 2002, plaintiff went out on a

leave of absence as a result of a sinus condition.  (Plaintiff at

39-41).  In December 2002, plaintiff's leave of absence continued

as a result of a back condition.  Plaintiff remained on medical

leave from September 27, 2002 until February 10, 2003.

(Plaintiff at 40-41, 44; Exh. 8).  On February 6, 2003,

plaintiff's physician, Dr. Helion Cruz, released plaintiff to

return to work with the restriction of working no more than a

4

six-hour shift. (Plaintiff at 44). Plaintiff testified that when she reported for work she showed Lamont Taylor her doctor's excuse, he informed her that Dell did not have any jobs where she could work just a six-hour shift. (Plaintiff at 45). Thus, plaintiff went back on medical leave. Plaintiff's leave extended for an additional two weeks, because she was not able to schedule an appointment with Dr. Cruz earlier than February 22, 2003. (Plaintiff at 45-47).

On February 22, 2003, Dr. Cruz released plaintiff to return to work on February 24, 2003 with the following restrictions: standing, twisting, and walking limited to one to four hours a day and lifting was limited to no more than ten pounds. Plaintiff had no restrictions on her ability to sit, kneel, push, pull, climb, reach, keyboard, grasp, or squeeze. (Plaintiff at 47; Exh. 10). Dr. Cruz also estimated that plaintiff would be able to return to work with no restrictions on March 13, 2003. (Plaintiff at 47; Exh. 10). Plaintiff was informed that Dell would accommodate those restrictions. Because plaintiff worked the AWS shift, her first day back at work was February 28, 2003. (Plaintiff at 48). Soon after her return from medical leave, Chris Valentino became plaintiff's supervisor. (Plaintiff at 52-53).

As she anticipated, Dr. Cruz released plaintiff to full-duty with no restrictions on March 13, 2003. (Plaintiff at

5

49).  Plaintiff worked Friday, March 14, 2003 but was off from
work March 15 and 16.  (Plaintiff at 59; Exh. 5).  The next
weekend, plaintiff did not work on Friday, March 21; instead,
plaintiff went to see Dr. Andi Honeycutt because she was having
pain all over her body.  (Plaintiff at 59-61; Exh. 14).  Dr.
Honeycutt informed plaintiff that she could return to work the
following day, but she needed to limit her standing for long
periods of time.  Dr. Honeycutt also stated that plaintiff could
return to full-duty on March 28, 2003.  (Plaintiff at 61; Exh.
15).  Plaintiff did return to work March 22 and 23.  (Plaintiff
at 59; Exh. 5).

On Friday, March 28, 2003, plaintiff was absent again
and did not call in to Mr. Valentino.  (Plaintiff at 85-91;
Valentino Aff. at ¶ 5).  Plaintiff testified, and her medical
records confirm, that plaintiff visited the emergency room on
March 28 and was diagnosed as having acute bronchitis.  Dr. Allen
McFarland gave plaintiff a note to be off work for three days.
(Plaintiff at 82-85; Exhs. 18-20).  On Saturday, March 29, 2003,
plaintiff called in at 12:37 a.m. and left a voicemail for Mr.
Valentino stating that she had not been in that Friday and would
not be in Saturday "because she had to go to the doctor."
(Valentino Aff. at ¶ 5).  Plaintiff does not recall exactly what
time she called Mr. Valentino, however, plaintiff admits it was
late when she called.  (Plaintiff at 86-91).  According to Dell

6

policy, if an employee needs to miss a day of work, the employee is expected to call her supervisor at least thirty minutes prior to the start of her scheduled shift. (Valentino Aff. at ¶ 4). Plaintiff was well aware of this policy. (Plaintiff at 62, 94). An employee who failed to "show for work" or to call within the first four hours of work was deemed to be a "no call/no show". (Valentino Aff. at ¶ 4).

Plaintiff testified on Monday, March 31, 2003, she called UnumProvident to "see if [her medical leave] was still in effect."[2] (Plaintiff at 227-231; Exh. 21). According to plaintiff, the representative told her "yes, they've still got you out." (Plaintiff at 228-229). However, plaintiff admits that she returned from medical leave in February 2003 and testified that when she called Unum on March 31, she talked to a "foreigner" with whom she had significant difficulty in communicating. (Plaintiff at 227-228). Plaintiff testified she called Unum again on Thursday, April 3. (Plaintiff at 230-232; Exh. 21).

According to Unum's records, plaintiff did not apply for a medical leave on April 3. (Affidavit of Timothy Cook, hereinafter "Cook" Aff. at ¶ 8, 11). Unum records show that on

---

[2]UnumProvident ("Unum") is a Long Term Disability ("LTD") insurance provider for Dell and is responsible for administering Short Term Disability ("STD") benefits and Family and Medical Leave Act ("FMLA") leaves of absence for Dell employees. (Cook Aff. at ¶ 2).

March 21, 2003, plaintiff called Unum and requested that Unum
open a new claim for STD benefits because she was missing work
due to her back.  Unum informed plaintiff that she was not
eligible for STD benefits but Unum also notified its Family and
Medical Leave ("FML") department of plaintiff's call.  The FML
unit processed the call as a request for FMLA leave and
immediately denied that request because she had exhausted her 12
weeks of annual FMLA leave.  (Cook Aff. at ¶ 7).  Plaintiff did
not inquire about her FMLA status again until April 8, 2003, at
which time she was told that her request for leave had been
denied on March 21 because she had exhausted her eligibility for
FMLA leave.  (Cook Aff. at ¶ 9).  Unum did not understand
plaintiff to have called and requested an additional leave of
absence between March 22, 2003 and April 8, 2003 and when she did
make such inquiry on April 8, 2003, she was informed that she was
not eligible for FMLA leave.  (Cook Aff. at ¶ 11).

        Plaintiff testified that on Monday, March 31, 2003, she
also called Dr. William Mays, her psychiatrist, because she was
feeling depressed.  (Plaintiff at 99-100).  Plaintiff was not
able to speak directly with Dr. Mays but she left him a
voicemail.  (Plaintiff at 100).  Dr. Mays returned plaintiff's
call on Wednesday, April 2.  Plaintiff told Dr. Mays she felt
like she was having a nervous breakdown and Dr. Mays suggested
that plaintiff check into the Partial Hospitalization Program at

8

Tennessee Christian Medical Center ("TCMC"). (Plaintiff at 100-102; Deposition of William R. Mays, M.D., hereinafter "Mays" at 54-55).

Plaintiff went to Tennessee Christian on Friday, April 4 and completed the intake process.[3] (Plaintiff at 100; 106-107). Plaintiff did not go to work that day and did not report to work that weekend. (Plaintiff at 103, 112; Exh. 5). Initially, plaintiff testified during her deposition that she did not remember calling Mr. Valentino to report her absence that weekend. (Plaintiff at 108). Later, plaintiff recalled that she called Dell and left a voicemail message on April 4 while she was completing the intake process at TCMC, stating only that she would not be in that Friday and until further notice she did not know when she would be in. (Plaintiff at 118, 123-124). Mr. Valentino did not receive any such message. (Valentino Aff. at ¶ 6). When plaintiff failed to report to work, Mr. Valentino called the service that administers time away from work for Dell and was informed that plaintiff had not applied for a leave of absence. (Valentino Aff. at ¶ 6). Plaintiff also did not report to work on April 5 or 6. (Plaintiff at 103, 112; Exh. 5, 21). Therefore, Mr. Valentino understood plaintiff to also be in a no call/no show on Friday, Saturday, and Sunday, April 4, 5, and 6.

_____

[3]Plaintiff did not begin the outpatient program until Monday, April 7. (Plaintiff at 137-139).

9

(Valentino Aff. at ¶ 7).

Mr. Valentino discharged plaintiff on Sunday, April 6, for no call/no show for four days. Mr. Valentino called plaintiff on April 6 and informed her that she was being terminated under Dell's policies. (Plaintiff at 113-116). Plaintiff entered the PHP program on Monday, April 7, as she had planned on doing. (plaintiff at 137-139). Plaintiff's psychiatrist subsequently informed the Tennessee Employment Commission that she was unable to work as a result of her depression until April 28, 2003. (Mays at 74). Although within two months after her termination plaintiff informed her psychiatrist that she was feeling "fine" mentally (indeed, three months later she stated she was feeling "the best I've felt in years"), she remained unable to return to work due to physical symptoms until January 2005, almost two years later. (Plaintiff at 145-147, 249; Exh. 12).

**Plaintiff's Equal Employment Opportunity Commission (EEOC) Charge and Pro Se Lawsuit**

On May 28, 2002, shortly after plaintiff's transfer to EG1, plaintiff filed an EEOC charge, alleging discrimination on the basis of age and disability. (Plaintiff at 143; Exh. 26). On December 23, 2002, the EEOC dismissed plaintiff's charge without cause and issued plaintiff a Notice of Right to Sue. (Complaint at ¶ 12). Plaintiff subsequently attempted to file a

10

lawsuit <u>pro</u> <u>se</u> in the case styled <u>Debra A. Dorris v. Dell Computer Corp</u>., Civil Action No. 3:03-MC-0027. (Plaintiff at 175; Exh. 30). Plaintiff also filed an application to proceed <u>in forma</u> <u>pauperis</u> but such application was denied. (Plaintiff at 175-176; Exh. 31, 33). Plaintiff never paid the fee required for filing her initial complaint and so her initial complaint was never actually filed nor served upon defendant.

## III.  Discussion

### A.  <u>Standard of Review</u>

Summary judgment is appropriate when there is no genuine issue of material fact such that the moving party is entitled to a judgment as a matter of law.  <u>In Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court explained that
[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict.
The "mere possibility" of a factual dispute does not suffice to create a triable case.  To defeat summary judgment, the plaintiff "must come forward with more persuasive evidence to support [his or her] claim than would otherwise be necessary."  If the defendant successfully demonstrates, after a reasonable period of discovery, that the plaintiff cannot produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment is appropriate.  When determining whether to reach this conclusion, we view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party.

11

<u>Combs v. Int'l Ins. Co.</u>, 354 F.3d 568, 576-77 (6th Cir. 2004)(citations omitted).

B. <u>Conclusions of Law</u>

The causes of action presented here arise under the Tennessee Handicap Act (THA), Tenn. Code Ann. § 8-50-103 <u>et seq.</u>, and the Tennessee Human Rights Act (THRA), Tenn. Code Ann. § 4-21-101 <u>et seq.</u> (Docket Entry No. 1, pp. 4-6). The THA prohibits:

> discrimination in the hiring, firing and other terms and conditions of employment ... of any private employer, against any applicant for employment based solely upon any physical, mental or visual handicap of the applicant, unless such handicap to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved.

Tenn. Code Ann. § 8-50-103(a). The THRA was enacted to "[s]afeguard all individuals within the state from discrimination because of race, creed, color, religion, sex, age or national origin in connection with employment ...," and includes within its definition of discriminatory practices "retaliat[ion] or discriminat[ion] in any manner against a person because such person has opposed a practice declared discriminatory by this chapter or because such person has made a charge [of discrimination]..." Tenn. Code Ann. §§ 4-21-101(a)(3), 4-21-301.

Defendant has distilled plaintiff's complaint into four claims, two of which accrued prior to her termination and two of which accrued upon her termination. It does appear from the

12

particulars of plaintiff's complaint that her reassignment and alleged demotion in May 2002 is one focus of her age and disability discrimination claims, along with the alleged hostile and retaliatory work environment she was subjected to following her filing of an EEOC charge in May 2002. Plaintiff's complaint likewise focuses on her termination on April 6, 2003, as being motivated by age and disability discrimination, and as being in retaliation for the filing of her EEOC charge and the attempted filing of her *pro se* federal complaint in March 2003. The undersigned would agree that the claims based on discrimination and retaliation which ceased prior to April 6, 2003, are subject to dismissal for their untimeliness, while the claims based upon her discharge on that date are subject to dismissal for a failure to prove their "essential elements."

### 1. Untimely Claims

As defendant points out, claims under the THA and the THRA are subject to the latter's one-year statute of limitations, Tenn. Code Ann. § 4-21-311(d).[4] That section provides that an action must be filed "within one (1) year after the alleged discriminatory practice ceases." Plaintiff filed her complaint in this case on April 6, 2004, exactly one year after her

_____

[4]The THA, codified at Tenn. Code Ann. § 8-50-103, states in subparagraph (b)(2) of that section that the aggrieved person "shall have all rights provided" in §§ 4-21-302 -- 4-21-311 of the THRA. See also Barnes v. Goodyear Tire and Rubber Co., 48 S.W.3d 698, 705 (Tenn. 2000)("The THA embodies the definitions and remedies provided by the Tennessee Human Rights Act.").

13

discharge from employment.  Accordingly, any alleged act of
discrimination under the THA or THRA, or of retaliation under the
THRA,[5] occurring prior to April 6, 2003, cannot be the subject of
a timely claim.[6]  Plaintiff's relocation from the Nashville
facility and alleged demotion occurred in May 2002, well outside
of the limitations period.  Likewise, the events which formed the
basis for plaintiff's hostile/retaliatory work environment claim
(described in defendant's memorandum, Docket Entry No. 37, pp.
10-12) occurred prior to April 2003, with some occurring even
before the relocation in May 2002.  Accordingly, these claims of
age and disability discrimination and retaliation are time-
barred.

_____

[5]As referenced in footnote 2 above, the language of § 8-50-103(b)(2) of
the THA specifically incorporates §§ 4-21-302 -- 4-21-311 of the THRA, but not
§ 4-21-301.  It is § 4-21-301 which declares it unlawful for a person to
"[r]etaliate or discriminate in any manner against a person because such
person has opposed a practice declared discriminatory by this chapter or
because such person has made a charge [of discrimination]..."  In light of the
omission in § 8-50-103(b)(2) of the rights and remedies described in § 4-21-
301, defendant argues that the THA does not permit a cause of action for
retaliation.  The undersigned must concur.

[6]As defendant notes, the sequence of events presented here would not
justify the finding of a continuing violation culminating in plaintiff's
discharge, so as to render all discriminatory/retaliatory actions complained
of timely.  The only action complained of which occurred within the
limitations period was her discharge from employment.  However, the summary
judgment proof establishes that this action was taken independently from what
is alleged to have been hostile work environment discrimination, as the
supervisor who discharged plaintiff, Chris Valentino, had only supervised
plaintiff for about a month prior to discharging her, and had not talked to
plaintiff or otherwise acquired knowledge about her physical or mental
condition or her EEOC charge.  (Docket Entry No. 42-3, pp. 6-8; Docket Entry
No. 39, ¶ 8).  Without some evidence of discriminatory/retaliatory animus
which links plaintiff's discharge with the harassing acts alleged to have
occurred outside the limitations period, there can be no continuing violation
here.  See Burzynski v. Cohen, 264 F.3d 611, 618 (6th Cir. 2001).

14

2.  <u>Discriminatory Discharge Based on Disability</u>

   With regard to plaintiff's discriminatory discharge
claim under the THA, she must show that she was qualified for the
position she held; that she was disabled; and that she was
discharged because of that disability.  <u>Barnes v. Goodyear Tire
and Rubber Co.</u>, 48 S.W.3d 698, 705 (Tenn. 2000).  Looking to
federal law for guidance in enforcing its own anti-discrimination
law, <u>id.</u>, the <u>Barnes</u> court established that the third element of
a THA claim, proof of discriminatory animus, may be satisfied
under the direct or indirect evidentiary methods familiar to
federal discrimination jurisprudence.  48 S.W.3d at 708 (<u>citing</u>,
<u>e.g.</u>, <u>Texas Dep't of Comm. Affairs v. Burdine</u>, 450 U.S. 248
(1981).  Assuming *arguendo* that plaintiff was qualified and
disabled, the undersigned would agree with defendant that the
only evidence plaintiff offers which could arguably support the
proposition that she was discharged because of that disability is
her testimony that she was discharged while out on a medical
leave of absence (Docket Entry No. 42-3, pp. 6-7).  <u>Cf.</u> <u>Monette
v. Elec. Data Sys. Corp.</u>, 90 F.3d 1173, 1187 (6th Cir.
1996)(finding that replacement of Monette while he was out on
medical leave established that employer "relied on Monette's
disabled status to replace him").

   This testimony is not direct evidence of
discrimination, but is rather indirect evidence which, if

15

believed, would nullify the reason given by defendant as justifying plaintiff's termination.  The undersigned will assume for present purposes that plaintiff could establish a *prima facie* case of discrimination.  However, without further proof from plaintiff raising an issue of fact as to whether defendant's reason was a pretext for discrimination, rather than merely an honest mistake[7] as to plaintiff's leave status, this case cannot survive summary judgment.  See <u>Versa v. Policy Studies, Inc.</u>, 45 S.W.3d 575, 581 (Tenn. Ct. App. 2000)("The question is not whether the employer's decision was sound," but whether the evidence supports an inference "'that the company lied about its proffered reasons for [the employee's] dismissal.'").  In viewing the proof aligned against this deposition testimony, the undersigned must conclude that no reasonable juror could accept plaintiff's position on the issue of her leave status, or her position that her discharge was motivated by disability discrimination.

As previously discussed, it is the uncontradicted testimony of Mr. Valentino that he was not aware that plaintiff

---

[7]The Sixth Circuit has held that if the employer has an honest belief in its nondiscriminatory reason for discharging the plaintiff, then that plaintiff cannot demonstrate pretext simply by showing that the employer's reason for discharge was incorrect.  <u>Majewski v. Automatic Data Processing, Inc.</u>, 274 F.3d 1106, 1117 (6th Cir. 2001).  The proof here shows that Mr. Valentino "reasonably relied 'on the particularized facts that were before [him] at the time the decision was made," and so held an honest belief in his asserted grounds for discharging plaintiff.  <u>Id.</u> (<u>quoting</u> <u>Smith v. Chrysler Corp.</u>, 155 F.3d 799, 807 (6th Cir. 1998).

16

suffered from any disability. Though plaintiff testified that at the time of her discharge she was out on a leave of absence necessitated by her disability, and that she called Mr. Valentino while she was completing the intake process at Tennessee Christian Medical Center on April 4, 2003, and left him a voicemail message explaining that she would not be in to work that day or until further notice (Docket Entry No. 42-2, pp. 26-28), these items are insufficient to establish defendant's knowledge that her absence was a result of her alleged disability. Even if Mr. Valentino received plaintiff's voicemail, which he testified he did not (Docket Entry No. 39, ¶ 6), the contents of that voicemail as described in plaintiff's testimony would not have put Mr. Valentino on notice of plaintiff's *disability*, versus her simple unavailability due to some unexplained reason. Cf. Brenneman v. Medcentral Health Sys., 366 F.3d 412, 420 n.4 (6th Cir. 2004)(declining to consider, in analysis of whether employee's attendance record was sufficient to make him a "qualified individual with a disability" under ADA, employee's absences explained by his statement that he was "ill" or "not feeling well," since these statements "would not have reasonably apprised defendant that the absences were related to a disability rather than some general illness.").

Moreover, Mr. Valentino's affidavit testimony, as well as that of an executive for the corporate leave administrator for

17

defendant, Mr. Timothy Cook, establishes that plaintiff was not approved for medical leave at the time of her discharge. (Docket Entry No. 39, ¶ 6; Docket Entry No. 41, ¶ 11). While plaintiff understandably might feel that her four absences should have been excused as they resulted from illness prompting an emergency room visit and an exacerbation of emotional problems, it is clear that her absences were not pursuant to an approved medical leave or otherwise properly reported. Because plaintiff took leave without approval and without calling to report her absence within four hours of the start of her shifts scheduled for March 28, 2003, and April 4-6, 2003, or at the very least because Mr. Valentino honestly believed that her leave was unapproved and unreported, plaintiff was properly discharged for being a multiple "no call/no show" offender under company policy (Docket Entry No. 39, ¶¶ 4-7). Plaintiff has failed to prove pretext or any contrary, discriminatory reason for her discharge, instead passively relying on her own deposition testimony which, at worst, demonstrates an honest mistake by defendant regarding her leave status. Accordingly, this claim must fail.

### 3. Discriminatory Discharge Based on Age

Plaintiff has not offered any direct evidence that her termination was related to her age. Thus, the burden shifting format under which this claim must be analyzed requires that plaintiff raise an inference of discrimination by showing that

18

she (1) was at least forty years old; (2) was subject to an adverse employment action; (3) was qualified for the position; and (4) was replaced by a younger person. <u>Chelton v. Provident Companies, Inc.</u>, 2003 WL 21458585, at *3 (Tenn. Ct. App. June 19, 2003)(<u>citing</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)).

While it appears that plaintiff meets the first three *prima facie* criteria above, she has not demonstrated that she was replaced by a younger person. Even if she could carry her *prima facie* burden, plaintiff cannot demonstrate that any similarly situated person under forty years of age was allowed to keep her job despite what the employer perceived to be a series of "no call/no shows," and so could not raise a factual issue as to pretext. <u>Versa</u>, 45 S.W.3d at 581. While plaintiff testified during her deposition that a young woman named Kim was allowed to keep her job despite being out on a longer medical leave (Docket Entry No. 42-3, p. 9), this testimony fails to establish or even suggest that Kim retained her job despite taking unapproved and unreported leave. Moreover, plaintiff's suggestion of defendant's corporate bias against older workers is flatly contradicted by her own hiring and promotion at the age of 43.

The undersigned thus concludes that plaintiff's claim of age-related discriminatory discharge under the THRA is without merit.

4.  <u>Retaliatory Discharge</u>

The *prima facie* requirements of a retaliatory discharge claim under the THRA are as follows: (1) an activity protected by the statute; (2) the employer's knowledge that the employee engaged in the protected activity; (3) a subsequent adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. <u>Newsom v. Textron Aerostructures</u>, 924 S.W.2d 87, 96 (Tenn. Ct. App. 1995). In this case, plaintiff cannot establish the second or fourth requirements. As to the employer's knowledge of her EEOC filing, the proof of Chris Valentino's ignorance of this protected activity has already been discussed above. Moreover, as to causation, the lapse of almost one year between plaintiff's EEOC filing on May 28, 2002, and her discharge on April 4, 2003, suggests that the two are entirely unrelated.

Finally, even if plaintiff could establish a *prima facie* case of retaliation, the legitimate, non-retaliatory reason proffered by defendant has not been shown to be pretextual, as discussed above. The undersigned concludes that plaintiff's retaliation claim too must fail.

### IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that defendant's motion for summary judgment be **GRANTED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

ENTERED this 6th day of June, 2006.

  /s/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge

Case 3:04-cv-00299  Document 52  Filed 06/07/06  Page 21 of 21 PageID #: 476